## THE FREDERICKA SCHEPP.

(District Court, D. Rhode Island. April 5, 1912.)

No. 1,279.

1. SHIPPING (§ 16*)—FORFEITURE OF VESSEL FOR FALSE REGISTRY.

In case of the forfeiture of a vessel for false registry, under Rev. St. §§ 4143, 4163, or 4189 (U. S. Comp. St. 1901, pp. 2809, 2825, 2836), the forfeiture dates from the time of seizure, and not from the date of the illegal act.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 30–44; Dec Dig. § 16.*]

2. UNITED STATES (§ 76*)—LIENS—PRIORITIES.

Where a vessel was seized, forfeited, and sold for false registry after she was loaded and was about to sail on a voyage, the fund realized from the sale is chargeable with the payment of such claims as constitute maritime liens such as for seamens' wages and for supplies and of claims of shippers and passengers for freight and passage money paid for the voyage, but claims for money deposited with the managing owner to pay the passage of certain persons on the return voyage are not allowable because whether the relation of ship and passenger would ever arise was a matter of such uncertainty that no present lien arose.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 59; Dec. Dig. § 76.*]

3. SUBROGATION (§ 23*)—LIENS—PRIORITIES.

When a vessel is forfeited for false registry one who in her behalf had paid the head tax due on alien passengers brought in by her, which is made a lien on the vessel by Immigration Act February 20, 1907, c. 1134, § 1, 34 Stat. 898 (U. S. Comp. St. Supp. 1911, p. 499), is entitled to be subrogated to such lien and to payment from the proceeds of the vessel.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 60–66; Dec. Dig. § 23.*]

4. MARITIME LIENS (§ 37*)—PRIORITIES.

A purchaser of a part interest in a vessel after she has become liable to forfeiture for false registry, but before her seizure, conceding that he might under some conditions be entitled to a standing as a lienor, cannot be allowed to displace maritime liens on the vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 58–70; Dec. Dig. § 37.*]

In Admiralty. Libel by the United States for forfeiture of the schooner Fredericka Schepp for false registry. Hearing on libels of intervention against proceeds.

Walter R. Stiness, for the United States.

Archibald C. Matteson, for defendant.

Stephen J. Casey, for certain intervening claimants.

BROWN, District Judge. The schooner Fredericka Schepp was seized for a false registry as she was about to sail on a voyage for the Cape de Verde Islands, and was sold pursuant to a decree of forfeiture. The proceeds were paid into the registry of the court, and various libels of intervention have been filed making claim to said proceeds.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The illegal act involving forfeiture was committed October 17, 1910, the vessel was seized October 10, 1911, and the libel filed October 11, 1911.

The libel was in several counts, and was based upon sections 4143, 4163, and 4189, R. S. (U. S. Comp. St. 1901, pp. 2809, 2825, 2836).

[1] The first question is from what time the forfeiture takes effect, whether from the date of seizure, October 10, 1911, or the date of the illegal act, October 17, 1910.

In United States v. Stowell, 133 U. S. 1, 10 Sup. Ct. 244, 33 L. Ed. 555, upon a statute using the words, "shall be forfeited to the United States," it was held that the forfeiture took effect from the time of the commission of the offense. Under sections 4143 and 4163 the forfeiture is in the alternative, either of the vessel or of the value thereof. Until election by the United States between the alternative remedies, title to the vessel does not pass to the United States. Under section 4189 there is no election, but the language used is, "Such vessel," etc., "shall be liable to forfeiture." The question is raised whether there is a substantial difference between the two expressions, "shall be forfeited," and "shall be liable to forfeiture." Upon this question there is direct conflict of authority.

Judge Lowell in The Mary Celeste, 2 Lowell, 354, Fed. Cas. No. 9,202, said:

"I can find no legal distinction between the various forms of expression by which a forfeiture without an alternative is expressed."

The contrary view was taken by Judge Deady in The Kate Heron, 6 Sawy. 106, Fed. Cas. No. 7,619. Judge Deady said:

"The substitution of the language, 'shall be liable to forfeiture,' for 'shall be forfeited,' indicated that it was the intention of Congress when it enlarged this section, so as to make it applicable to vessels engaged in domestic commerce, to change the time when a forfeiture for its violation should take place, so that such vessels might be bought and sold without the danger of an innocent purchaser being affected by the secret taint of a prior, but unknown, violation of the law."

He held that a purchaser in good faith may acquire title between the date of the illegal act and the seizure by the government, and may hold the property against the government. The finding that a change in intention was indicated by a change in phraseology is in accordance with the views expressed in Crawford v. Burke, 195 U. S. 176, 190, 25 Sup. Ct. 9, 49 L. Ed. 147.

No other American cases are cited to me on this point, but the opinion of Judge Deady, finding a substantial distinction between the two expressions, derives some support from the observation of Lord North in James v. Young, 27 Ch. D. 652, 655. In construing a statute concerning a lease or gale of a mine the expression used was:

"Then the said gale shall be liable to be forfeited as and for a breach of condition."

It was contended that, as soon as there was a default, there was an absolute forfeiture. The learned judge said:

"But in the first place, if the Legislature had intended that, I think it would have said so. Nothing could have been easier than to have said, 'It

shall be forfeited, and come to an end.' I say nothing about the construction of those words if they had been there; but when the words are not 'shall be forfeited,' but 'shall be liable to be forfeited,' it seems to me that what was intended was not that there should be an absolute forfeiture, but a liability to forfeiture which might or might not be enforced."

The question is not free from difficulty. On the one hand, if we follow the decision in The Kate Heron, there is an opportunity for the violator of law to defeat the enforcement of the forfeiture. On the other hand, there is the avoidance of the great hardship that an innocent purchaser, in good faith, should lose property acquired long after a violation of law in which he had no concern and of which he was ignorant. There seems no special reason for a distinction between the time of forfeiture under sections 4143, 4163, and 4189, and Judge Deady's view has the possible advantage of reconciling or giving uniformity to these three sections and making the forfeiture date from the time of seizure in each case.

While forfeiture statutes, like others, are to have a reasonable construction, they are not to receive the harsher of two equally reasonable constructions; and, if the Legislature has not definitely expressed itself, it is consistent with fair rules of construction to decide in favor of a bona fide purchaser for value. With a confession of doubt I decide that the forfeiture dates from the time of seizure.

[2] As to claims of certain maritime liens, it is immaterial whether the forfeiture accrued at the date of the illegal act or at the date of seizure.

In the St. Jago de Cuba, 9 Wheat. 409, 416, 6 L. Ed. 122, it was said:

"In case of wreck or salvage it is unquestionable that forfeiture would be superseded; and we see no ground on which to preclude any other maritime claim, fairly and honestly acquired. We concur, then, in the opinion of the court below that the fair claims of seamen and subsequent material men are not overreached by the previous forfeiture," etc.

See, also, The J. E. Rumbell, 148 U. S. 1, 9, 13 Sup. Ct. 498, 37 L. Ed. 345; Moran v. Sturges, 154 U. S. 256, 282, 14 Sup. Ct. 1019, 38 L. Ed. 981; The Siren, 7 Wall. 152, 158, 159, 19 L. Ed. 129.

For the United States it is contended that only such maritime claims as represent a contribution to the preservation of the vessel or to aid the title of the United States should be allowed, and that maritime claims for supplies, advances, and services to aid the vessel to proceed upon a foreign voyage arising after the date of the illegal acts should be disallowed. But this distinction assumes that title passed to the United States at the date of the illegal act, and seems inapplicable if title of the United States dates only from seizure.

The claim of Peter Cruz, mate, for wages from September 5, to October 10, 1911, the date of seizure, of Henry C. Greenhalgh, ship chandler, of Manuel Court for supplies, are maritime claims for which the fund is chargeable. The claim of Helman was too late.

Stephen J. Casey, Esq., presents the claims of a large number of persons who paid in advance, passage money or freight money, for the voyage to the Cape de Verde Islands, which was broken up by the seizure. I am of the opinion that for freight money paid in advance,

on account of cargo received aboard before the seizure, a lien attached; and that, for passage money paid in advance by passengers who were ready to sail upon the voyage and were prevented only by the seizure there should be a similar lien. Passage money and freight money stand upon the same footing. To deny a lien to the passenger who had paid his passage because he had not crossed the gang plank, though ready to do so, does not seem just. The Zenobia, Fed. Cas. Nos. 18,208, 18,209; The Main v. Williams, 152 U. S. 122, 131, 14 Sup. Ct. 486, 38 L. Ed. 381; The Moses Taylor, 4 Wall. 427, 18 L. Ed. 397.

Claims are also made for certain sums deposited with James F. Silva, managing owner, to pay for bringing to the United States on the return voyage certain persons then in the Cape de Verde Islands. These payments were by persons who were not themselves passengers, and whether the relation of passenger and carrier would ever arise in future between the vessel and the persons for whose benefit the money was deposited was a matter of such uncertainty that no present lien took effect in their behalf. The claims must be disallowed.

[3] The claim of Manuel Brito is supported by a New Bedford customhouse receipt showing the payment by Brito of the sum of $304 on May 26, 1911, for head tax from alien passengers. The act of February 20, 1907 (34 Stat. 898), makes this tax a lien on the vessel. As this lien was discharged by Brito himself, I am of the opinion that he has a lien therefor. The fact that he received from two of the owners a demand note, secured by an agreement never carried out, to convey to him one-third of the vessel, did not in my opinion divest this lien. Brito was produced as a witness, and I am of the opinion that to infer from his testimony an intention to rely on the credit of owners would be unjust. His lien rests upon his act of paying the money at the customhouse. That he had any more definite understanding of the situation than that the vessel would be good for it I cannot believe. This claim is allowed.

[4] The claim of James F. Silva, managing owner, to maritime liens upon the theory that the forfeiture took effect at the date of the violation of law, October 17, 1910, and that consequently the mortgage to him and subsequent bill of sale to him were of no effect, is disposed of by what we have already said. Silva became managing owner and beneficial owner of one-third of the vessel before the seizure. Upon the most favorable view of the facts, he was a bona fide purchaser for value of one-third of the vessel, and under the doctrine of The Kate Heron might possibly be entitled to claim as innocent owner one-third of the proceeds. But this point need not be considered further, since the liens allowed to other interveners attach to the entire vessel and exhaust the fund, thus rendering immaterial any question between the United States and Silva.

If it be assumed that though a part owner Silva might under some conditions be allowed a standing as a lienor, he could not be allowed to deprive maritime creditors of their security. Pettit v. The Charles Hemje, Fed. Cas. No. 11,047a. The argument that upon equitable principles Silva should be restored to the rights of a lienor for advances is unsound. There is no evidence that the bill of sale was

accepted as further security for a previous loan; on the contrary, payment of the debt was acknowledged, and a mortgage to secure that loan was discharged of record. Silva became an owner with only an owner's rights, and it was through his own activities that a large part of the maritime liens attached.

The claim of Silva is disallowed. The claim of his proctor must also be disallowed. There was no fund preserved by him for the benefit of any the interveners. Upon her seizure the ship was already bankrupt through maritime liens. The sale of the vessel for a sum insufficient to meet these liens effectually disposed of all rights of an innocent owner or of the United States to share in the proceeds.

A draft decree for distribution may be prepared accordingly.